**WILLIAM B. TANNER COMPANY, INC., Plaintiff,**

v.

**SPARTA–TOMAH BROADCASTING COMPANY, INC., d/b/a Radio Station WCOW, Defendant.**

No. 81–C–279.

United States District Court, W. D. Wisconsin.

May 19, 1982.

Julian & Olson, Madison, Wis., for plaintiff.

Rice & Abbott, Sparta, Wis., for defendant.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

This is an action for damages based in contract. Jurisdiction is predicated on diversity of citizenship and amount in controversy pursuant to 28 U.S.C. § 1332.

Before the Court are cross motions for summary judgment. It appears that there are no genuine issues of material fact concerning liability. Defendant's motion for summary judgment is denied, and plaintiff's motion for summary judgment is granted. The Court will deny judgment as to damages. The following facts are undisputed.

### FACTS

Plaintiff William B. Tanner Company, Inc., (hereinafter, "Tanner") is a Tennessee corporation headquartered in Memphis. Tanner is in the business of producing and marketing audio promotional packages for

use by local radio stations. Tanner is the successor in interest to other corporations in the same business who entered into contracts with the defendant. These other corporations are Pepper Sound Studios, Inc., Pepper and Tanner, Inc., and Mars Broadcasting, Inc.

Defendant Sparta-Tomah Broadcasting Company, Inc. is a Wisconsin corporation, and the licensee of radio station WCOW, with its principal place of business at Sparta, Wisconsin (hereinafter, "WCOW").

On or about August 1, 1966, WCOW and Tanner (by one of its predecessors through an agent) entered into a contract whereby Tanner would lease to WCOW a package of promotional materials entitled "Instant Library Services." The term of the contract was for three years, commencing on September 1, 1966. Tanner was to supply an initial package at that time and provide ten additional productions per month for the term of the contract. At the end of the term of the contract WCOW was required to return all of the materials provided by Tanner.

The contract obligated WCOW to pay $1,908 in cash for the materials in monthly installments of $53 for the term of the contract. In addition, the station was obligated to provide 2,340 one-minute advertising spots to Tanner for use or resale by Tanner. The contract provision concerning these spots follows:

> 3. Station also agrees to pay additionally for use of the above productions in broadcast time upon request by MARS BROADCASTING, INC., as follows: *2340* one-minute spots, with ⅓ of total number in drive time and the remainder in best time available between 6 A.M. and 7 P.M. These spots are preemptable, and since they are considered partial payment for service(s) received, they are to be valid until used. A conversion of the above

spot total to a cash credit based upon lowest rate per time classification as per published rates as in SRDS this date, may be exercised by MARS BROADCASTING, INC., in the event nighttime schedules and/or shorter length announcements are desired.

On or about December 9, 1967, WCOW and Tanner (by another predecessor) entered into another contract whereby Tanner would produce and deliver to WCOW a package of materials entitled "Great Radio." Although denominated a "license," whereas the first contract was a "lease," this contract was virtually identical to the first. The contract was for a term of one year commencing February 1, 1968, and obligated Tanner to provide the program materials in exchange for $477 and additional spots. The contractual provision concerning spots was identical to the one set out above except that the number of spots to be provided to Tanner was 520, and the "best available time" provision was to be between "6 A.M. and 9 P.M." rather than "6 A.M. and 7 P.M."

Both of these contracts were form contracts prepared by Tanner's predecessors. The first contract was altered at the insistence of WCOW by the deletion of an automatic renewal provision.

Both of the contracts were performed by both parties during the term of the contracts satisfactorily. However, Tanner used few, if any, of its spots during the term of the contract.[1] Neither contract was renewed, and the materials supplied by Tanner were returned in a timely fashion at the end of the contracts in 1969.

In 1974, Tanner requested the use of 34 spots for its client, Scour-Vax-Reo. The request was honored without any attempt by WCOW to bill Tanner for the spots. In 1978, Tanner requested the use of 48 spots

---

1. By implication, Tanner's complaint claims that no spots were requested during the period when WCOW was running the materials provided by Tanner. The total of spots called for in the contracts was 2,860. Tanner claims to have used a total of 82, part in 1974 and the remainder in 1978, leaving 2,778 unused.

WCOW asserts no knowledge as to the number used, although the station agrees that 82 were used in 1974 and 1978. The dispute as to this fact (and as to the method of valuing the unused spots) leaves the Court unable to grant judgment as to damages.

for its client, Lipton Lite Lunch. The request was honored without any attempt by WCOW to bill Tanner for the spots. The latter group of spots ran from November 6, 1978 to December 1, 1978.

On January 10, 1979, WCOW, through its president, John D. Rice, by letter refused to honor an additional request for spots. The letter stated as follows:

Gentlemen:

Enclosed is a Radio Broadcast Order for d-Con Rat Killer which arrived here today. I am returning it to you as rejected. The original agreement with your company is something like a dozen years old. It is so old I no longer have a record of it. Neither do I know how much you have used on a total of how much. If you have something which shows this, please send it to me for my examination. Until I receive it, I can schedule nothing more that comes through the William B. Tanner Co.

Yours truly,

(signed)

John C. Rice, President

This action was commenced on May 7, 1981. Tanner demands judgment for the value of 2,778 unused spots at the fair market value of such spots, $14,723.40 at $5.30 per spot.[2]

## DECISION

In opposition to Tanner's motion for summary judgment, and in support of its own motion, WCOW argues that the contracts in question contain conflicting terms which raise an ambiguity problem and that, in turn, requires an application of the rules of construction by the Court. Since a contract with ambiguous terms should be construed against the party who drafted it (Tanner here), WCOW reasons that the contracts should be construed to foreclose Tanner's right to spots at any time after the term of the contract.

The ambiguity seen by WCOW concerns the fact that both contracts were for a limited term, and, at the same time, contained the following sentence:

These spots are preemptable, and since they are considered partial payment for service(s) received, they are to be valid until used.

According to WCOW, the quoted sentence could mean that contract performance would extend forever, thus contradicting the express time period of the contracts.

 This Court cannot agree. The language quoted above is clear and in no way contradicts the time period limitation of the contracts. Without any resort to rules of construction, the language states that the spots are part of the consideration to be paid for the materials provided to the radio station. Because of that fact, the spots are "valid until used." When the language of a contract is plain and unambiguous, the language should be given its plain meaning and there is no need to consider extrinsic circumstances, case law or rules of construction. *Amidzich v. Charter Oaks Fire Ins. Co.*, 44 Wis.2d 45, 170 N.W.2d 813 (1969).

The time period limitation of the contract concerned the leased or licensed material provided to the station by Tanner. The spots were granted as consideration for that material. The spots were available to Tanner without regard to that time limitation. Although Wisconsin Courts have not, as far as the Court is aware, considered this problem in this context, this state's Courts do recognize that options on real estate constitute valid consideration and that such a contract is not void because the option was for an indefinite period. *Fleischman v. Zimmermann*, 258 Wis. 194, 45 N.W.2d 616 (1951).

WCOW cites *William B. Tanner Co. Inc. v. Plains Broadcasting Company*, 486 F.Supp. 1313 (W.D.Okla.1980) as authority that the "valid until used" language is am-

**2.** This final sentence is plaintiff's assertion and is not considered true but is included merely to justify the Court's exercise of jurisdiction. There are still genuine issues of material fact concerning damages. (Tanner, in an amendment to the complaint, now claims that each spot is worth $7.20.)

biguous. For practical purposes, the contract in *Plains* appears to be identical to the one at issue here, and that Court did indeed find that the term was ambiguous, citing *Pepper & Tanner, Inc. v. KEDO, Inc.*, 13 Wash.App. 433, 535 P.2d 857 (1975). The *KEDO* Court prorated the spots on a yearly basis over the five year period of the contract. The *Plains* Court held that Tanner's right to the spots ended with the term of the contract.

Judge West in *Plains* felt so "blessed with such persuasive precedent" from *KEDO*, 486 F.Supp. at 1317, that he was compelled to find that the contract terms were ambiguous. This Court is in no way convinced by the reasoning of those cases despite the fact that they are on point with the case here, at least as it concerns the meaning of the language at issue. The sentence means what it says. The parties had their eyes open and freely contracted. There is no reason to give the language at issue anything other than its plain, common sense meaning. *State ex rel. Siciliano v. Johnson*, 21 Wis.2d 482, 124 N.W.2d 624 (1963).

"These spots .are preemptable," means that the station had the right to "bump" advertisements booked by Tanner when the station's other customers wanted those slots. The phrase "and since they are considered partial payment for service(s) received," means, without a shadow of a doubt, that the spots are to be considered compensation or consideration for the materials supplied by Tanner. Finally, the phrase "they are to be valid until used" means that the spots are to be available for Tanner's use until the supply is exhausted. That the spots were to remain available even after the time period specified for Tanner's performance of his obligation need not be implied by the language. It is explicit. Two cases cited by Tanner, *William B. Tanner Co. Inc., v. Pacific Western Broadcasters, Inc.*, 49 R.R.2d 1525 (Oregon Cir.Ct.1981) and *William B. Tanner Co., Inc. v. Granite District Radio B/Casting Co.*, 49 R.R.2d 219 (Utah Dis.Ct.1980), are in accord with this view.

WCOW's most persuasive argument is that this interpretation creates an obligation which might continue ad infinitum. Citing *Farley v. Salow*, 67 Wis.2d 393, 227 N.W.2d 76 (1975) for the proposition that the Court should imply a reasonable time for performance, WCOW asserts that a reasonable time is that contained in the contracts; that is, three years on one contract and one year on the other. This Court does not reach the issue of what a reasonable time in this context might be for two reasons.

First, the action is before the Court because the station unilaterally decided that the time had become unreasonable. It decided to do so a little more than one month after it had completed running spots for Tanner's client, Lipton Lite Lunch. This court, as has already been established, does not believe the contract time period to be determinative of Tanner's right to spots. Whatever is a reasonable time after that, it cannot be unilaterally imposed by the station with neither notice nor an opportunity for Tanner to use his spots.

Second, the issue is not one of an indefinite period for performance by WCOW: rather it is an indefinite period during which Tanner can demand compensation for value given to WCOW. Framed this way, the issue is more properly one of laches which was raised as a defense in WCOW's answer but was not briefed.

In *Schneider Fuel & Supply Co. v. West Allis State Bank*, 70 Wis.2d 1041, 236 N.W.2d 266 (1975), the Wisconsin Supreme Court stated that:

> To successfully assert the defense of laches it must be established that there exists: "(1) unreasonable delay, (2) lack of knowledge on the part of the party asserting the defense that the other party would assert the right on which he bases his suit, and (3) prejudice to the party asserting the defense in the event the action is maintained." (citing *Greenfield v. West Milwaukee*, 272 Wis. 215, 75 N.W.2d 424 (1956).)

236 N.W.2d at 272. The Court will grant that WCOW is prejudiced. In the interim

between contracting and the present, the station has undertaken significant improvements which make the value of the spots greater now than they were when the bargain was entered into. And, for the sake of argument, the Court will assume that the time period here—about 10 years—constitutes unreasonable delay. However, the second condition above, lack of knowledge on the part of WCOW that Tanner would assert the right to the spots, has not been met and could not be met under the facts of this case.

Tanner did not begin asserting this right in January of 1979 when WCOW refused to honor the request for spots. The right was asserted, and honored, in 1974 and again in 1978. Laches might have made a much better defense in 1974 had it been asserted then. WCOW knew that, shortly before it refused to honor further requests for spots, Tanner was still asserting a right to them.

## CONCLUSION

Based on the facts of this case, this Court is unconvinced that there is any need to go further than the language of the contract. That language is unambiguous, and is the best evidence of the intent of the parties. While it may be that WCOW did not know that Tanner would continue to assert the right to spots for such a period after the remaining provisions of the contracts were completed, the terms of the contract giving that right are not uncertain.

As noted in the section of the opinion setting out the facts, there remain genuine issues of fact concerning the measure of damages. The parties do not agree as to the number of spots which remain unused and WCOW has not briefed the issue of the value of each spot (that is, at what time the value should be measured). Therefore, judgment as to damages will not be granted.

## ORDER

Based on the foregoing, and an examination of the materials submitted in this matter:

IT IS ORDERED that defendant's motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment is GRANTED, but only as to liability.