**Amy SINGER and Trial Consultants, Inc., Plaintiffs**

v.

**WEST PUBLISHING CORPORATION, Defendant.**

**Nos. 02–22827–CIV, 02–22827–CIV.**

United States District Court, S.D. Florida.

March 16, 2004.

James F. Rittinger, Mark Lerner, Satterlee Stephens Burke & Burke LLP, Jonathan Cohen, Shutts & Bowen, for West.

Jon R. Pearce, Shuttleworth & Ingersoll, Michael J. Higer, Mintz, Truppman, Clein & Higer, for Singer.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

UNGARO–BENAGES, District Judge.

THIS CAUSE was tried before the Court between January 5, 2004 and January 7, 2004.

THE COURT has considered the pertinent portions of the record and is otherwise fully advised in the premises.

#### Findings of fact

#### I. Procedural history

1. On September 24, 2002, Plaintiffs Dr. Amy Singer ("Dr.Singer") and Trial Consultants, Inc. ("Trial Consultants") filed a one-count complaint stating a cause of action for breach of contract and seeking damages against Defendant West Publishing Corporation ("West"). Plaintiffs' Complaint and Demand for Jury Trial.

2. This cause was tried upon the facts by the Court between January 5, 2004 and January 7, 2004.

#### II. The parties

3. Dr. Singer is a trained psychologist and the President and CEO of Trial Consultants, a Florida corporation whose staff of lawyers and psychologists provides clients with trial consulting services. Trial Transcript, at 96–98. Collectively Dr. Singer and Trial Consultants will be referred to as "Plaintiffs."

4. West is a Minnesota corporation authorized to transact business in Florida. Defendant's Answer, at 1.

#### III. The Singer Databases

3. This is an action for breach of a contract ("the Agreement") between Plaintiffs and West pursuant to which Singer granted West a license to publish three databases entitled Jury Doctor, Case–In–A–Snapshot, and Recommendations. Plaintiffs' Complaint; Plaintiffs' Trial Exhibit 1, at Exhibit A. Collectively these databases will be referred to as "the Singer Databases."

4. The Jury Doctor database is a relational database consisting of approximately 33,000 model voir dire questions organized into thematic categories and subcategories. Trial Transcript, at 133. This database was created using a Lotus Notes platform. *Id.*

5. The Case–In–A–Snapshot "database" is an archive of Microsoft Word documents rather than a relational database, and consisted of case reports previously prepared by Plaintiffs. *Id.*, at 98–99. As generated and maintained by Plaintiffs, these case reports included the names of the parties and attorneys in each case. *Id.* at 380–81.

6. The Recommendations database is a relational database which provided jury-selection recommendations according to the facts and substantive claims involved in a particular lawsuit. *Id.* at 99, 380. This database was maintained as a Fox Pro database on a Macintosh computer. *Id.* at 98.

## IV. The terms of the parties' Agreement.

7. The Agreement was executed by Dr. Singer on July 26, 2000, and had an effective term of six years from that date. Paragraph 14.1 provided that either party reserved the right to terminate the Agreement immediately upon written notice to the other party of the occurrence of certain events, which included "the other party failing to cure a material breach hereof committed by it within 60 days after receiving written notice thereof." Plaintiffs' Trial Exhibit 1.

8. Dr. Singer was represented by counsel in connection with the negotiation of the Agreement. Amended Pretrial Stipulation, at 4.

9. Paragraph 1 of the Agreement provides that "[t]he terms and provisions of this agreement represent the complete and entire agreement between the parties, Singer and West Group. Further, this agreement supersedes all provisions of any and all preexisting agreements with reference to the Singer Databases between the parties. Any amendment hereof must be in writing and signed by both parties."

10. Paragraph 5.1 of the Agreement describes West's contractual obligations as follows:

West Group shall be responsible for developing West Group Services display formats for Singer Databases and producing, loading and storing Singer Databases as part of the West Group Services. As used herein, 'display formats' means the appearance of Singer Databases as displayed on CD–ROM, online or in other electronic format, the organization of Singer Databases internally and as displayed on CD–ROM, online or in other electronic format, and the manner in which Singer Databases are presented, whether in a separate database,

in combination with other databases ... and the like.

Plaintiffs' Trial Exhibit 1.

11. Although ¶ 6.1 of the Agreement provides, with emphasis added, that West was responsible for "*selling, marketing or otherwise promoting* [the sale of the Singer Databases] in a timely manner" upon publication, the Agreement is silent regarding the period of time within which West was obliged to publish the Singer Databases. *Id.*

12. Paragraph 4.1 of the Agreement obliged Plaintiff to "deliver to West Group the current version of the [Singer Databases] in a machine-readable form agreed upon by West Group and Singer" as soon as practicable after the effective date of the Agreement. *Id.*

13. Paragraph 5.2 of the Agreement obliged Plaintiff to "provide West Group with reasonable assistance in interpreting the composition or other data mnemonics included in Singer Databases, and in the development of display formats and in producing, loading and storage of Singer Databases as part of the West Group Services." *Id.*

14. Paragraph 10 of the Agreement required both parties to "cooperate" and "use [their] best efforts" to further the purposes of the Agreement. *Id.*

15. Exhibit B to the agreement, which governed the license fees to which Plaintiffs were entitled through ¶ 3 of the Agreement, provided that Plaintiffs would receive a nonrefundable advance license fee of $ 100,000 upon Defendant's release of the Singer Databases for sale. *Id.* Defendants also agreed to pay Plaintiffs license fees in the amount of twenty percent of Defendants' revenues resulting from sales of the Singer Databases. *Id.*

16. Exhibit B also provided that Dr. Singer reserved the right to continue sell-

ing and distributing the Singer Databases until their "release . . . for sale by West Group." *Id.*

17. West signed the Agreement on August 11, 2000. *Id.*

## V. Plaintiffs' actions following execution of the Agreement

18. In the fall of 2000, Dr. Singer did not make herself available to explain the format of the Singer Databases, and did not assist West in the conversion of the data to a database which could be published on any of the electronic platforms used by West. Transcript, at 445.

19. Dr. Singer implied that the Singer Databases were in good condition and machine readable by West for easy conversion at the time the Agreement was executed. *Id.* at 81, 120–21, 248, 317. However, the testimony of West's Glenn Ferguson, the West director responsible for publication of the Singer Databases, and C. Joseph Miles, West's Principal Attorney Editor, as well as the e-mails of the consultant West hired at Dr. Singer's recommendation to extract and convert the data to allow access and publication by West, are to the contrary. *Id.* at 92–93, 434; Defendant's Trial Exhibits 12, 13. As the consultant noted, the files were "screwed up," and he would "hate to receive all this and have to make sense of it." Defendant's Trial Exhibits 12, 13.

20. As of March 19, 2001, Dr. Singer believed West's failure to publish the Singer Databases was a breach of the Agreement's terms and communicated this perceived breach to West through attorney Paul Salver. Defendant's Trial Exhibit 2.

21. Plaintiffs, however, did not finally deliver to West all of the Singer Databases in machine-readable form until June 26, 2001. Transcript, at 187, 271–72, Defendant's Trial Exhibits 15, 16.

22. Dr. Singer's focus after signing the Agreement was receipt of the $ 100,000 nonrefundable advance rather than helping West obtain publishable databases and updates. Transcript, at 396–97.

23. Dr. Singer understood her obligation to update the Singer Databases to be satisfied upon providing West employees with passwords which allowed access to updated database information. Dr. Singer did not herself transmit database updates to West. Transcript, at 160–61, 178, 185–86.

24. Plaintiffs' own conduct and work product—in the form of the integrity of the data, the format of the databases, Dr. Singer's insistence that West was in breach of the Agreement before delivery of all the databases was complete, and the letters and calls from various attorneys on behalf of Plaintiff regarding publication of the databases—added to the time it took West to publish the Singer Databases. Transcript, at 336–37.

25. On September 16, 2003, Plaintiffs terminated the Agreement pursuant to ¶ 14.1 after placing Defendant on notice of an alleged breach of the Agreement's terms based on West's failure to publish the Singer Databases by May 2003. Defendant's Trial Exhibits 32, 34.

## VI. West's reasonable efforts to publish the Singer Databases

26. Plaintiffs have no evidence of whether West's failure to publish the Singer Databases between the time the Agreement was executed in July 2000 and Plaintiffs' termination of the Agreement in September 2003 was unreasonable in comparison to practice within the electronic database publication industry. Pretrial Conference Transcript, at 49–50. At trial, Plaintiffs did not attempt to demonstrate that relational databases are customarily

published within a certain time following receipt of the data by the publisher.

27. Plaintiffs produced copies of two email messages among West employees in July 1999, one year before execution of the Agreement, which state that it would require between six and nine months to "develop" the Singer Databases as a CD–ROM–based product. Plaintiffs' Trial Exhibits 15, 16. At this time, West employees had not seen the data contained in the Singer Databases. Transcript, at 90.

28. The only evidence in the record as to how long publication might take that is concurrent with or postdates Plaintiffs' execution of the Agreement was an estimate communicated orally by West to Plaintiffs in July 2000. At this time West employees anticipated publication of a Westworks-based online product in six to nine months. Transcript, at 305–06, 311–31. This estimate was made before West knew the condition of the data, and before West had settled on the online platform to be used for distribution of the Singer Databases.

29. The Court notes that the Agreement is silent regarding the platform through which the Singer Databases will be published, thereby reserving to West the right to choose among CD–ROM–, Westworks- and Westlaw-based methods of distributing the Singer Databases.

30. West's publication of the Singer Databases was delayed as a result of West's decisions to change the platform through which the databases would be delivered from a CD–ROM product to a Westworks product, and finally to an internet-based Westlaw online product. Transcript, at 422, 425–26.

31. The Singer Databases represented a new type of product for West. Transcript, at 392, 455. West had no way of knowing for certain how long publication would take because of the unique technical requirements of the Singer Databases. Id. at 454–55.

32. The project was highly technical and required numerous editorial and technical steps in order to compile the data, purge the data of corrupted information, remove the names of parties and attorneys involved in particular cases, and integrate the three components of the Singer Databases into a single relational database. Transcript, at 92, 434, 438–43; Plaintiffs' Trial Exhibit 7.

33. In addition to the technical work required to format and integrate the data contained in the Singer Databases, West was required to cross reference the data contained in the Singer Databases with the West key numbering system. Transcript, at 438–39.

34. Although West might have been more diligent in its efforts to publish the Singer databases, Plaintiffs offered no evidence of bad faith by West.

## VII. Plaintiffs' damages as a result of the alleged breach

35. Plaintiffs seek to recover the lost use of the $ 100,000 nonrefundable advance they would have received upon publication of the Singer Databases and all royalties lost as a result of Defendant's alleged untimely publication of the Singer Databases. Amended Pretrial Stipulation, at 4–5.

36. Plaintiffs waived any claim for the payment of the advance itself. Amended Pretrial Stipulation, at 4–5; Transcript, at 18.

37. The only basis for Plaintiffs' estimate of the royalties that would have been earned by the Singer Databases is a June 17, 1999 letter from West—composed one year before the Agreement was executed—which estimates a five year royalty stream for a CD–ROM product. Tran-

script, at 61, 69–70, 311–13; Plaintiffs' Trial Exhibit 4.

38. The letter, which does not set forth the basis for the estimate, clearly states in two places that the projections contained therein are estimates and did not represent guaranteed annual royalty payments upon publication of the Singer Databases. Plaintiffs' Trial Exhibit 4. No data underlying the estimates contained in this letter was introduced at trial.

39. Plaintiffs submitted no other documentary evidence for their claim of lost royalties other than the June 1999 letter. They submitted no earnings history for the databases, no history of customer interest or usage, no earnings for comparable publications, no evidence that customers would accept this type of product in an online environment without the personal services of Dr. Singer and her staff, nor even any market research as a basis for the forecasts in the 1999 letter.

40. Despite the license conferred to West through the Agreement, Plaintiffs were permitted to continue to exploit the databases in the normal course of business and lost no revenue during the period between execution of the Agreement and Plaintiffs' termination of the Agreement.

### VIII. Mitigation of damages

41. Plaintiffs have not proven that they were damaged by West's alleged failure to publish the Singer Databases before September 2003. Further, Plaintiffs failed to reasonably reduce any speculative damages through their unilateral termination of the Agreement and decision to discontinue working with West toward publication.

42. Plaintiffs did not introduce any credible evidence that they would in any way have incurred additional costs or suffered additional injuries if West had been allowed to publish the Singer Databases in September 2003.

43. Even if Dr. Singer had concerns regarding the quality of the Singer Databases in September 2003, Plaintiffs could have reasonably mitigated any damages resulting from the delayed publication of the Singer Databases by continuing to work with West towards publication at a future date.

44. West was prepared to pay to Plaintiffs the nonrefundable $ 100,000 advance upon publication of the Singer Databases in September 2003, and Plaintiffs' decision to terminate the Agreement prevented Plaintiffs from receiving this advance and earning royalties pursuant to the Agreement's terms.

45. By terminating the Agreement, Plaintiffs also cut off West's ability to earn any money from the sale of the Singer Databases from which to pay the royalties, let alone recoup its investment in the development of these databases.

### Conclusions of law

### I. Defendant did not breach the terms of the parties' Agreement

■ 1. Under Minnesota law,[1] the elements of a breach of contract claim are (1) the formation of a contract; (2) performance by plaintiff of any conditions precedent; and (3) a breach of the contract by the defendant. *Industrial Rubber Applicators, Inc. v. Eaton Metal Products*, 285 Minn. 511, 171 N.W.2d 728, 731 (1969), *overruled on other grounds by Standslast v. Reid*, 304 Minn. 358, 231 N.W.2d 98, 103

---

**1.** Paragraph 20 of the Agreement provides that the contract shall be governed by and

under the laws of the state of Minnesota.

(1975); *Selstad v. City of Loretto*, 1992 WL 166795, at *2 (Minn.Ct.App. July 21, 1992).

2. Unambiguous contract terms shall be enforced according to the agreement's plain and ordinary language, *Bank Midwest v. Lipetzky*, 674 N.W.2d 176, 179 (Minn.2004); *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346–47 (Minn.2003), and parol evidence will not be allowed to alter the terms of that contract, *Norwest Bank Minnesota, N.A. v. Midwestern Machinery Co.*, 481 N.W.2d 875, 881 (Minn.Ct. App.1992). Where a written agreement is integrated, no prior oral agreement relating to that agreement may vary its terms, and contemporaneous oral agreements are not admissible to vary the contract's unambiguous terms. *Id.*

3. Where a contract is silent regarding the period of time within which performance must be completed, Minnesota law incorporates a general rule that the contract must be performed within a reasonable time. *Hill v. Okay Construction Co.*, 312 Minn. 324, 252 N.W.2d 107, 114 (1977); *William B. Tanner Co. v. Waseca–Owatonna Broadcasting*, 549 F.Supp. 411, 414 (D.Minn.1982). The question of reasonable time for the performance of contract obligations is generally reserved for the fact finder. *Henry v. Hutchins*, 146 Minn. 381, 178 N.W. 807, 809 (1920).

4. Although industry custom regarding the performance of contract obligations under similar circumstances is one relevant factor, the determination of a reasonable time for performance of specific contractual obligations is a factual inquiry which depends on the particular circumstances of each case. *Cf. Henry*, 146 Minn. at 386–87, 178 N.W. 807 (finding that the reasonable amount of time in which one party was obliged to make mortgage payments pursuant to a written contract was to be determined by reference to each contracting parties' financial circumstances at particular points in time).

5. Plaintiffs failed to submit credible evidence as to what would have been a reasonable time for publication of the Singer Databases.

6. Plaintiffs assert that the Singer Databases should have been published within six to nine months of the Agreement's execution, but failed to demonstrate by the preponderance of the credible evidence that this period was the reasonable amount of time for West's performance of its obligations pursuant to ¶ 5.1.

7. The conclusory testimony by Dr. Singer and Mr. Salver that West, before it had reviewed any data contained in the Singer Databases, anticipated publication would require six to nine months does not meet the preponderance of the evidence standard in terms of demonstrating that West failed to publish within a reasonable time. This testimonial evidence was not confirmed by the more credible testimony of Mr. Miles, who did not remember such statements and indicated that no accurate projection could have been made because the product was unique and new to West. Transcript, at 391, 454–455. Furthermore, the testimony of Dr. Singer and Mr. Salver provides the Court with no information regarding the technical basis for this estimate.

8. The July 1999 email messages stating that the Singer Databases would be developed within six to nine months of project approval are insufficient for several reasons to establish that West was obliged to publish within this period of time. The email messages by their terms refer to the development of a CD–ROM–based product, and this platform was subsequently abandoned by West in favor of online distribution of the databases. Plaintiff has introduced no evidence that

suggests the six to nine month estimate was applicable to development of an online product. Furthermore, the email messages are silent as to whether the time required for "development" of the Singer Databases was the equivalent of the time required for publication of the databases. Finally, these email messages predate the Agreement, were composed at a time when West had not reviewed the data and do not include sufficient factual information regarding the basis for the estimate to allow the Court to consider the effect of the following factors on this estimated time for development: Plaintiffs' late delivery of the databases, the poor condition of the data and Plaintiffs' failure to affirmatively provide data updates or technical assistance.

9. Aside from the evidence discussed in paragraphs seven and eight above, Plaintiffs have introduced no credible evidence that would allow the Court to determine a reasonable amount of time for technical development and publication of the Singer Databases. Plaintiffs have therefore failed to prove by a preponderance of the evidence that either six to nine months or any other period of time between execution of the Agreement in July 2000 and Plaintiffs' termination of the Agreement in September 2003 was the reasonable amount of time for West to have published the Singer Databases.

10. Plaintiffs thus failed to establish that West did not publish the Singer Databases within a reasonable time, and have failed to establish that West breached their implicit obligation to perform pursuant to ¶ 5.1 of the Agreement within a reasonable amount of time.

## II. Plaintiff has failed to establish the amount of alleged damages with reasonable certainty

■ 11. To the extent that Plaintiffs seek to recover royalties that would have been earned upon West's publication of the Singer Databases, Minnesota law allows recovery of lost profits "only when ... the amount of loss is ascertainable to a reasonable degree of certainty." *Fung v. Riemenschneider*, 2003 WL 21005539 *4 (Minn. App. May 6, 2003) (citing *Faust v. Parrott*, 270 N.W.2d 117, 121 (Minn.1978)). Lost profits need not be proved with mathematical certainty, but must be supported by "evidence of definite profits grounded upon a reasonable factual basis." *Id.* (citing *Cardinal Consulting Co. v. Circo Resorts, Inc.*, 297 N.W.2d 260, 267 (Minn.1980)).

■ 12. The only evidence provided by Plaintiffs regarding the amount of royalty payments that would have been earned upon West's publication of the Singer Databases is a June 1999 letter from West. This letter by its terms only estimates future royalty streams and is insufficient to establish a reasonable factual basis for the estimation of damages. The letter does not provide the Court with the factual basis for the estimate contained therein and advises Plaintiffs explicitly that the figures do not represent a guarantee of future royalty payments.

13. Plaintiffs have not attempted to extrapolate from these figures or any other evidence royalty projections for an online version of the Singer Databases, and have not attempted to adjust the figures contained in the June 1999 letter based on changes made to the Singer Databases or changes in the market for these databases following execution of the Agreement in July 2000.

14. Finally, Plaintiffs have not attempted to generate independently any royalty projections based on the profits earned by the databases through the operation of Trial Consultants.

15. As a matter of law, the record contains insufficient evidence from which the

Court may reasonably estimate the royalties that would have been earned by the Singer Databases upon their publication, and as a result Plaintiffs may not recover these speculative royalty payments.

**III. Plaintiffs failed to mitigate any damages that may have been suffered as a result of West's failure to publish the Singer Databases before September 16, 2003**

16. Even if Plaintiffs had established a reasonable amount of time for publication of the Singer Databases or had provided a reasonable factual basis for the estimation of royalties that would have been earned upon publication, Plaintiffs are not entitled to recover any damages due to their unilateral termination of the Agreement.

17. Plaintiffs were obliged to use reasonable diligence to minimize any damages they perceived as a result of West's alleged breach. *Lanesboro Produce & Hatchery Co. v. Forthun*, 218 Minn. 377, 16 N.W.2d 326, 328 (1944)(relying on *Wavra v. Karr*, 142 Minn. 248, 172 N.W. 118 (1919)).

18. Assuming arguendo that West had breached the terms of the Agreement by failing to publish the Singer Databases within a reasonable amount of time, the Court concludes that Plaintiffs' unilateral termination of the Agreement was inconsistent with Plaintiffs' obligation to mitigate any damages. Based on the length of the relationship between the parties, the unique nature of the product being developed and published, and Plaintiffs' termination of the Agreement shortly before West's anticipated publication of the Singer Databases, the Court concludes that this was a situation in which mitigation would have been "best served by continuing existing arrangements" between the parties and allowing publication to occur. *S.J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 530 (3d Cir.1978). *See also Stanspec Corp. v. Jelco, Inc.*, 464 F.2d 1184, 1187 (10th Cir.1972) ("A damaged party entitled to the benefit of a contract is under a duty to mitigate his damages, and generally speaking his rights are not diminished if the circumstances force him to deal with the party in default.").

19. Although Plaintiffs believed at the time of terminating the Agreement that West was in breach of its implicit obligation to timely publish the Singer Databases, Plaintiffs' termination cut off all possibility of publication and receipt of the advance and royalties for the sale of the Singer Databases. Despite Plaintiffs' conclusory allegations regarding the quality of the Singer Databases that West was prepared to publish, Plaintiffs have produced no evidence that allowing the databases to be published would have in fact affected Plaintiffs negatively. The Court concludes that Plaintiffs' duty to mitigate any perceived damages encompassed an obligation not to unilaterally terminate the Agreement and prohibit West from publishing the Singer Databases—and thereby trigger the advance payment and royalty licensing fee provisions of the Agreement.

20. As Plaintiffs' termination of the Agreement was inconsistent with this obligation, Plaintiffs are precluded from recovering any royalty payments that would have been earned after September 16, 2003 because of Plaintiffs' failure to act reasonably to mitigate damages through allowing publication to occur.

### FINAL JUDGMENT

Pursuant to Federal Rules of Civil Procedure 52 and 58, this Court's Findings of Fact and Conclusions of Law, entered March 16, 2004, and for good cause shown, it is hereby

ORDERED AND ADJUDGED that a FINAL JUDGMENT is entered against

Plaintiffs, Amy Singer and Trial Consultants, Inc., and in favor of Defendant, West Publishing Corporation, upon Plaintiff's complaint herein.

This Court retains jurisdiction over attorney's fees and costs issues associated with the above-styled cause.