STATE OF MAINE                                          SUPERIOR COURT
YORK, ss.                                               DOCKET NO. CV-15-0120

MATTHEW WILLEY                         )
                                       )
          Plaintiff,                   )
                                       )
    v.                                 )          **ORDER**
                                       )
COUNTY OF YORK                         )
                                       )
          Defendant.                   )
                                       )

## I.     Background

### A. Procedural History

This case involves the alleged retaliation by a correctional officer sergeant against one his subordinates. After the subordinate filed a complaint against the sergeant, the sergeant allegedly engaged in a series of adverse actions against the other correctional officer for several years before he resigned from his post. Plaintiff Matthew Willey brought an administrative action against defendant County of York with the Maine Human Rights Commission. The action was dismissed after a right to sue letter was issued to plaintiff on March 9, 2015. Plaintiff then filed the instant Complaint on June 19, 2015, alleging retaliation in violation of the Maine Whistleblowers' Protection Act ("WPA"). Defendant now moves for summary judgment.

### B. Facts

Plaintiff Matthew Willey worked as a correctional officer at York County Jail beginning in March of 2008. (P.S.M.F. ¶ 1.) Sgt. Michael Seaman, who worked the day shift, and Sgt. Jill Brooks, who worked the evening shift, supervised plaintiff during his shifts. (P.S.M.F. ¶ 2.)

Plaintiff lays out an extensive history of complaints and adverse employment actions beginning in July of 2011. On the first occasion, plaintiff placed two inmates on lockdown for

1

violating policy. (P.S.M.F. ¶ 5.) Afterwards, Seaman came into the pod where plaintiff was stationed and removed the inmates from lockdown, stating that plaintiff was "abusing his power of authority." (P.S.M.F. ¶ 6.) One inmate responded to Seaman's statement, exclaming, "We can do anything we want because Sergeant Seaman will get us out of lockdown." (P.S.M.F. ¶ 7.)

Following this incident, plaintiff reported Seaman's conduct to Captain Rogers. (P.S.M.F. ¶ 13.) According to plaintiff, he believed that Seaman's conduct created a dangerous situation because it undermined plaintiff's authority with inmates. (P.S.M.F. ¶ 9.) He also believed that the incident violated the jail's code of conduct. (P.S.M.F. ¶ 10.) After this report, Captain Rogers told Seaman about the complaint and Seaman admitted to the incident having occurred. (P.S.M.F. ¶ 16.) Seaman did not hear anything more about this complaint. (P.S.M.F. ¶ 17.)

Within several weeks of the complaint, plaintiff alleges that Seaman began to retaliate against plaintiff. (P.S.M.F. ¶ 18.) According to plaintiff, Seaman would undermine Willey's authority, informing inmates that they could break the rules while Willey was working on the third shift. (P.S.M.F. ¶¶ 19-20.) Seaman also lifted sanctions that plaintiff had placed on inmates for rule violations. (P.S.M.F. ¶ 24.) Seaman would further force plaintiff to unlock the cells of inmates in lockdown and leave the pod. (P.S.M.F. ¶ 26.) Willey reported these incidents to management. (P.S.M.F. ¶¶ 21, 28.)

Further, Seaman posted a letter in the staff break room, stating, "I, Matthew Willey, have been starting rumors and stirring up the pot." (P.S.M.F. ¶ 39.) The letter also accused plaintiff of attempting to break up solidarity with the union. (P.S.M.F. ¶ 39.)

Seaman later spread a rumor about plaintiff, accusing him of planning on calling out sick on Christmas to "get drunk and party", causing other officers to send plaintiff notes calling him selfish and immature. (P.S.M.F. ¶¶ 41-42.)

2

Seaman also placed plaintiff on less desired posts and had the union switch plaintiff's vacation to his shift, causing Seaman to be able to deny many of plaintiff's requests. (P.S.M.F. ¶¶ 45, 49-50.) Seaman also disregarded plaintiff's request for overtime shifts. (P.S.M.F. ¶¶ 51-53.) Plaintiff was even forced on one occasion to go outside in the rain to pick up cigarette butts with an inmate. (P.S.M.F. ¶ 54.) In her deposition, Jill Brooks also stated that she believed Seaman's actions were retaliation for plaintiff's report. (P.S.M.F. ¶¶ 58-59.)

In response to Seaman's actions, plaintiff filed a harassment and discrimination complaint in September of 2012 against Seaman, accusing him of creating a hostile and unsafe work environment for himself and other employees and retaliating against him for his complaint to Captain Rogers. (P.S.M.F. ¶¶ 64-66.) The complaint was received by Gregory Zinser, the County Manager, but no action was taken concerning its allegations. (P.S.M.F. ¶¶ 66, 72.) Plaintiff does not allege that Seaman knew of this complaint.

In August of 2013, Seaman spread more rumors about plaintiff, including that plaintiff had attempted suicide. (P.S.M.F. ¶¶ 33-36; Pl.'s Opp'n to Def.'s Mot. Summ. J. 6.) According to plaintiff, inmates found out about this rumor and began to question his abilities. (P.S.M.F. ¶ 38.)

Plaintiff alleges that Seaman's retaliation, including placing plaintiff on undesirable assignments, continued until he left his position on March 28, 2014. (P.S.M.F. ¶ 73.) Plaintiff has testified that Seaman's conduct caused him psychological harm, including depression, which contributed to his substance abuse. (P.S.M.F. ¶¶ 79-83.)

According to plaintiff, he resigned because of Seaman's treatment and the County's failure to address his complaint. (P.S.M.F. ¶ 85.) However, defendant claims that plaintiff was forced to resign as a result of an OUI charge on November 3, 2013. (D.S.M.F. ¶ 8.) This charge was a violation of a consent agreement entered into between plaintiff and the Maine Criminal

3

Justice academy that allowed him to keep his corrections certificate as long he did not engage in disqualifying conduct. (D.S.M.F. ¶ 4.) After this charge, plaintiff was placed on administrative leave. (P.S.M.F. ¶ 9.) His certificate was ultimately revoked on April 24, 2014. (D.S.M.F. ¶¶ 22-23.) While handing in his resignation, plaintiff again told management of Seaman's treatment. Zinser was told about the complaints, however Zinser did not respond. (P.S.M.F. ¶¶ 88-91.)

## II. Discussion

### A. Summary Judgment Standard

"Summary judgment is appropriate if the record reflects that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Dussault v. RRE Coach Lantern Holdings, LLC*, 2014 ME 8, ¶ 12, 86 A.3d 52. A fact is material if it "has the potential to affect the outcome of the suit." *Deutsche Bank Nat'l Trust Co. v. Raggiani*, 2009 ME 120, ¶ 5, 985 A.2d 1. A party opposing summary judgment must "come forward with affidavits or other materials setting forth by competent proof specific facts that would be admissible in evidence to show . . . that a genuine issue of fact exists." *Bangor & A. R. Co. v. Daigle*, 607 A.2d 533, 535-36 (Me. 1992). "Evidence of factual elements offered to prove a claimed tort . . . need not be persuasive at [the summary judgment] stage, but the evidence must be sufficient to allow a fact-finder to make a factual determination without speculating." *Estate of Smith v. Cumberland Cnty.*, 2013 ME 13, ¶ 19, 60 A.3d 759. Additionally, in the context of summary judgment, "The Rules permit parties to rely on the affidavits of interested witnesses, including themselves, to establish or dispute a material fact." *Stanley v. Hancock Cty. Comm'rs*, 2004 ME 157, ¶ 19, 864 A.2d 169.

Although claims brought under the WPA originally applied the *McDonnell Douglas* burden shifting framework to the summary judgment stage, the Law Court has since dispensed

with this requirement, holding that the parties to such actions "are held to the same standard as in all other cases." *Brady v. Cumberland Cnty.*, 2015 ME 143, ¶ 39, 126 A.3d 1145. At the summary judgment stage, "the employee's burden of proving a prima facie case of retaliation is 'relatively light,' and requires only 'a small showing that is not onerous and is easily made.'" *Id.* ¶ 14 (citations omitted).

## B. Count I: Retaliation in Violation of the Maine Whistleblowers' Protection Act

To prevail on a WPA claim, the plaintiff must show: (1) they engaged in activity protected by the WPA; (2) they experienced an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Fuhrmann v. Staples the Office Superstore East, Inc.*, 2012 ME 135, ¶ 15, 58 A.3d 1083. In addition to Maine law, Maine Courts also use federal law to guide their analysis of WPA claims. *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 13, 915 A.2d 400 (citing *Maine Human Rights Commission v. City of Auburn*, 408 A.2d 1253, 1261 (Me. 1979) (stating that, in enacting the [Maine Human Rights Act], the Maine Legislature "intended the courts to look to the federal case law to 'provide significant guidance in [construing the] statute'") (quoting *Maine Human Rights Comm'n v. Local 1361, Me.*, 383 A.2d 369, 375 (Me. 1978))).

### i. Statute of Limitations

Before addressing plaintiff's prima facie case for retaliation in violation of the WPA, this Court must address defendant's contention that plaintiff's claim is time-barred by the statute of limitations. Under the WPA, "The action must be commenced not more than either 2 years after the act of unlawful discrimination complained of or 90 days after any of the occurrences listed under section 4622, subsection 1, paragraphs A to D, whichever is later." 5 M.R.S. § 4613(2)(C).

5

Relevant to the instant case, section 4622(1)(C) references a right-to-sue letter, which plaintiff did receive on March 9, 2015. However, plaintiff filed the present complaint on June 19, 2015, more than 90 days after receiving his right-to-sue letter. Consequently, the Complaint is not timely under this provision of the WPA.

However, plaintiff's claim may still be timely as to acts of unlawful discrimination that occurred on or following June 19, 2013, two years before the date of filing. The statute of limitations for WPA claims begins not when the act has reached a state of actual or absolute finality or permanence, but rather, whether the employee has 'receive[d] unambiguous and authoritative notice of the discriminatory act.'" *LePage v. Bath Iron Works Corp.*, 2006 ME 130, ¶ 15, 909 A.2d 629 (quoting *Morris v. Gov't Dev. Bank of P.R.*, 27 F.3d 746, 749 (1st Cir. 1994)).

There is a further difference for statute of limitations purposes between discrete acts and acts that comprise a hostile work environment. Generally, each adverse employment act is a discrete act or single occurrence, even when it has a connection to other adverse employment acts. *AMTRAK v. Morgan*, 536 U.S. 101, 111 (2002).[1] "A discrete retaliatory . . . act 'occurred' on the day that it 'happened.'" *Id.* at 110. Therefore, a party must file an action within the two-year time limit from the date of the act or it is barred. *Id.* Additionally, "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113.

On the other hand, a hostile work environment claim involves a series of separate acts that together constitute the unlawful employment practice (the federal term for adverse

---

[1] The Law Court has utilized the *Morgan* statute of limitations analysis in deciding WPA claims in *LePage v. Bath Iron Works Corp.*, 2006 ME 130, ¶ 12. The Superior Court has also previously accepted *Morgan* in *Frost v. State*, 2005 Me. Super. LEXIS 133.

6

employment action). *Id.* at 117. Thus, "[the] 'unlawful employment practice' . . . cannot be said to occur on any particular day." *Id.* at 115. Unlike discrete actions, it does not matter in hostile work environment claims that some of the alleged acts fall outside the statutory time period, so long as an act that forms part of the basis of the claim occurs within the period. *Id.* at 117. If one act falls within the period, the rest of the acts comprising the hostile environment claim are not time barred. *Id.*

Plaintiff has adequately, under notice pleading standards, set out a hostile work environment in this case. Although his Complaint does not directly assert the claim, it incorporates by reference his earlier complaints to management that do allege that he was subjected to a hostile work environment. (P.S.M.F. ¶ 65.) Defendant was on notice of such a claim. As Maine only requires notice pleading, plaintiff has alleged a hostile work environment claim.

Because plaintiff alleges that Seaman's conduct continued through his termination, a period of several months within the two-year statute of limitations, all of the actions that constitute the hostile work environment are not time barred and can be addressed in this action.

### ii. Protected Activity Under the WPA

The WPA protects an employee who in good faith reports, "what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of [Maine], a political subdivision of this State or the United States," or "what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual." 26 M.R.S.A. 833(1)(A-B). The good faith requirement is met when, "a report is motivated by a desire to stop the dangerous condition." *Stewart-Dore v. Webber Hosp. Ass'n*, 2011 ME 26, ¶ 11. To meet the reasonable cause requirement, the plaintiff

7

must present evidence, "showing that she had a subjective belief that a dangerous condition or practice existed, and that the belief was objectively reasonable in that 'a reasonable person might have believed that' a dangerous condition existed." *Id.* (quoting *Bard v. Bath Iron Works Corp.,* 590 A.2d 152, 154-55 (Me. 1991)).

Plaintiff points to three instances of protected activity in this case. First, plaintiff argues he engaged in protected activity when he reported Seaman's behavior following Seaman releasing inmates from lockdown and accusing Willey of "abusing his power of authority" in front of the inmates to Captain Rogers. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 3.) Willey argues that he made the complaint because he believed that Seaman's conduct was unlawful, violated the code of conduct, and placed his and other officers' safeties at risk. (P.S.M.F. ¶¶ 9-10.) Additionally, there is no indication of bad faith. Finally, this belief was reasonable due to the nature of plaintiff's work, the rigid laws and rules that must be followed, and the dangers posed in a prison work environment. Consequently, plaintiff has pleaded a prima facie case of protected activity for his first report to Captain Rogers.

Plaintiff also points to his written complaint in September of 2012, outlining Seaman's alleged retaliation following his first report to Captain Rogers. (*Id.* at 6.) Plaintiff alleged that he filed the report in an attempt to stop Seaman's behavior, which he believed to be a violation of law and a risk to his health and safety. Further, such belief was reasonable given the frequency of Seaman's alleged conduct and the environment in which it occurred. Thus, plaintiff has met his burden of proving a prima facie case of protected activity for this second report.

Finally, plaintiff reported Seaman's dissemination of the rumor that plaintiff had attempted to suicide to Gregory Zinser, the County Manager, in August of 2013. (*Id.*) Again, because plaintiff alleged that he filed the report in an attempt to stop Seaman's behavior,

8

believed Seaman's conduct to be a violation of law and also put his own health and safety at risk, and such belief was reasonable, plaintiff has met his burden of proving a prima facie case of protected activity for this third report concerning the rumor.

### iii. Adverse Employment Action

Next in the WPA retaliation analysis, an adverse employment action must be taken against the plaintiff. As discussed above, plaintiff has showed a triable issue of whether Seaman's action constitute a hostile work environment and thus an adverse employment action.

Hostile environment claims involve repeated or intense harassment sufficiently severe or pervasive to create an abusive working environment. *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 23, 824 A.2d 48 (citing *Morgan*, 536 U.S. at 115-16). In determining whether a hostile work environment exists, courts look to at the totality of the circumstances, including, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). Additionally, "The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive." *Id.*

Plaintiff has alleged that Seaman undermined plaintiff's authority, placed him on less-desirable shifts, and spread false rumors about him. Additionally, plaintiff has stated that these actions caused plaintiff psychological distress, including depression, leading to substance abuse. (P.S.M.F. ¶¶ 79-83).

These facts, taken together and in the light most favorable to the plaintiff, indicate that plaintiff was subjected to a hostile work environment. Thus, plaintiff has pleaded a prima facie case for the existence of an adverse employment action.

9

### iv. Causal Connection

Finally, a causal connection must exist between the protected activity and the adverse employment action. The only possible instance of protected activity with a causal link is the first report to Rogers. There is no indication that the adverse employment actions by Seaman occurred in response to either of the other reports.[2] There is no evidence to show that Seaman even was aware of these reports. Consequently, plaintiff must rely on the original report as the cause of the complained adverse employment actions.

The Law Court has stated a plaintiff, "need only present sufficient evidence to raise an issue of fact regarding whether her WPA-protected report 'was a substantial, even though perhaps not the only, factor motivating [the adverse employment action].'" *Fuhrmann v. Staples the Office Superstore East, Inc.*, 2012 ME 135, ¶ 20, 58 A.3d 1083 (quoting *Walsh v. Town of Millinocket*, 2011 ME 99, ¶ 25, 28 A.3d 610). A causal connection can also be pleaded circumstantially through a close temporal connection between the awareness protected activity and the adverse employment action. *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 1, 45 A.3d 722.

In the instant case, Seaman admitted to learning of plaintiff's first complaint. (P.S.M.F. ¶ 15.) Additionally, both plaintiff and Jill Brooks stated that they thought Seaman's following conduct towards plaintiff was in response to this complaint. (P.S.M.F. ¶¶ 18, 58.) Finally, only a few weeks had passed between when Seaman found out about the complaint and when the hostile work environment started. (P.S.M.F. ¶ 18.) Consequently, viewing the evidence in the light most favorable to the plaintiff, plaintiff has met his "relatively light" burden to plead a prima facie causal connection between the first complaint to Captain Rogers and Seaman's

---

[2] Plaintiff also admits for the purpose of summary judgment that he will not challenge the County's argument that a causal link does not exist between protected activity and his placement on administrative leave on November 5, 2013. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 16 n. 3).

conduct constituting a hostile work environment as a substantial motivating factor of the adverse activity.

## III. Conclusion

For the reasons set forth above, the defendant is not entitled to summary judgment on plaintiff's claim.

The clerk shall make the following entry on the docket:

Defendant's motion for summary judgment is hereby DENIED.

SO ORDERED.

DATE: October 5, 2017

ENTERED ON THE DOCKET ON: 10/6/17

John O'Neil, Jr.
Justice, Superior Court

11